John Burton, State Bar No. 86029
jb@johnburtonlaw.com
Ariana R.M. Gebauer, State Bar No. 292485
armgebauer@gmail.com
THE LAW OFFICES OF JOHN BURTON
4 East Holly Street, Suite 201
Pasadena, California  91103
Telephone: (626) 449-8300/Fax: (626) 449-8197

Michael J. Haddad, State Bar No. 189114
Julia Sherwin, State Bar No. 189268
haddad.sherwin@sbcglobal.net
HADDAD & SHERWIN
505 Seventeenth Street
Oakland, California  94612
Telephone: (510) 452-5500/Fax: (510) 452-5510

Attorneys for Plaintiff Trevor J. Paul

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| TREVOR J. PAUL,<br><br>           Plaintiff,<br><br>      v.<br><br>CITY OF RICHMOND, RICHMOND POLICE DEPARTMENT, CHIEF OF POLICE CHRIS MAGNUS, SERGEANT STONEBRAKER, SERGEANT GRAY,  DETECTIVE DANIEL CAMPOS (1486), OFFICER CARMEN SANTANA (1645), OFFICER ERNEST LOUCAS (1461), OFFICER MICHAEL VALLERGA (1484), OFFICER GUZMAN, OFFICER SANTANGELO and Does 1 through 50,<br><br>           Defendants. | Case No.<br><br>**COMPLAINT FOR DAMAGES FOR VIOLATIONS OF CIVIL RIGHTS**<br><br>**DEMAND FOR JURY TRIAL** |

**JURISDICTION AND VENUE**

1. This action for damages arises under 42 U.S.C. § 1983. Accordingly, subject matter jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1343. Plaintiff's state-law claims form part of the same case and controversy, and are within the supplemental jurisdiction of the Court pursuant to 28 U.S.C. § 1367.

2. Plaintiff's claims arise out of a course of conduct involving officials of the City of Richmond, in the County of Contra Costa, State of California, and within this judicial district.

**PARTIES**

3. Plaintiff Trevor J. Paul is an adult qualified to bring suit on his own behalf.

4. Defendant City of Richmond is a political subdivisions of the State of California. Defendant Richmond Police Department (RPD) is a public entity subject to suit. Defendant Chris Magnus is the RPD Chief of Police and is sued in his individual capacity. He is the relevant policy makers and was personally involved in the constitutional violations and other wrongful conduct alleged herein.

5. The individually named defendants, Sergeant Stronebraker, Sergeant Gray, Detective Daniel Campos, and Officers Carmen Santana, Ernest Loucas, Michael Vallerga, and Guzman, are law enforcement officers employed by the RPD. Plaintiff is informed and believes, and on that basis alleges, that Defendant Santangelo is an RPD officer. Each was involved in some manner with the investigation or imprisonment of Plaintiff.

6. Each individual defendant acted under color of law and within the scope of his or her agency and employment.

7. Does 1 to 50 are unnamed because their identities are not ascertained.

**EXHAUSTION OF ADMINISTRATIVE REMEDIES**

8. Plaintiff timely filed the appropriate administrative claims, which have been denied. This lawsuit is timely.

# FACTS

9. During the fall of 2014 Plaintiff Trevor J. Paul was employed full time as the program director at the Salesian Boys and Girls Club (the Club), which is located in Richmond, California, on premises belonging to the Salesian Society, an affiliate of the Catholic Church. Salesian High School is next door. Plaintiff is not affiliated with the Salesian Society or Salesian High School. The Club employed Plaintiff to manage daily operations, including the supervision of children enrolled at the Club, who are called "members." Before being hired, Plaintiff passed a thorough background check that revealed he had no criminal history. Chief Magnus and the RPD knew about and had access to this background check.

10. Sometime during the fall of 2014, the mother of a young boy, A.G., enrolled him as a member of the Club. While A.G.'s mother inspected the facility, she told Club staff that she was particularly concerned about security because her son had been abused sexually by a family member. She found the security layout satisfactory.

11. On November 14, 2014, A.G. urinated in his pants while at the Club. Other members teased and bullied A.G. Mr. Paul, as the supervisor, intervened to insure that staff helped the boy, and he disciplined the other members. At the end of the day, Mr. Paul told A.G.'s mother about the incident, and explained the actions taken to help A.G. and to discipline the members who teased and bullied him. A.G.'s mother was upset and questioned Mr. Paul whether the Club had done enough.

12. Plaintiff is informed and believes, and on that basis alleges that one week later, at about 7:00 p.m. on November 21, 2014, A.G.'s mother reported to the RPD that her son had been sexually abused at the Club from 2:30 to 6:30 p.m. that day. For some reason Mr. Paul was identified as the perpetrator, although he had no contact with A.G. during those hours. Given the layout and video surveillance, no such thing could have happened without multiple people knowing about it. The RPD dispatched Officer Carmen Santana, a recently hired patrol officer with no experience investigating sex crimes involving minors, to initiate an investigation. This fiasco followed.

- 3 -

13. At about 7:30 p.m., perhaps Officer Carmen Santana and at least one other RPD arrived at the Club. Heavily redacted reports provided by the RPD in response to Plaintiff's Public Records Act request indicate the other officer to be Michael Vallerga. Plaintiff has a distinct recollection that the officer whose conduct is described below was named Santangelo, however. Accordingly the references herein to Officer Vallerga may in fact be to an Officer named Santangelo.

14. Officer Vallerga asked for Mr. Paul, and was taken to the "computer" room where Mr. Paul was supervising about a dozen young people. Officer Vallerga instructed Mr. Paul to step outside. Mr. Paul did so, thinking there was a problem involving a member that needed to be discussed privately. They stood near the front of the building where members, staff, and parents could see what was happening. Officer Vallerga asked whether Mr. Paul had weapons. Mr. Paul said he did not. Officer Vallerga patted Mr. Paul down and handcuffed him. Officer Vallerga told Mr. Paul he was not under arrest, but was only being detained. Mr. Paul could tell that members, parents, and staff saw him handcuffed and in the custody of the RPD.

15. Mr. Paul asked Officer Vallerga why he was detained, and was told that there had been sexual abuse. Shocked, Mr. Paul asked who was involved. Without answering, Officer Vallerga removed Mr. Paul's wallet and gave his information to RPD dispatch, which responded that there were no warrants. Officer Vallerga then moved Mr. Paul to the parking lot, near where family members were picking up members at the end of the evening activities. Staff, parents, members, and others saw Mr. Paul standing handcuffed with Officer Vallerga. After ten to twenty minutes, Officer Vallerga moved Mr. Paul to the side of a building, still in view of people at the Club.

16. Reasoning that someone had falsely accused him of inappropriate conduct with a member, Mr. Paul told Officer Vallerga that the rooms had uncovered interior windows facing into the main areas, and that there were surveillance cameras throughout, the recordings of which would disprove any accusation. Mr. Paul offered to show Officer Vallerga surveillance videos right then.

- 4 -

17. Officer Vallerga responded that if what had been reported were true, Mr. Paul will never get out of prison. Officer Vallerga added that he had hoped Mr. Paul would make a "break for it" so he could sic his dog. Officer Vallerga added that he had gone to Salesian High School and "knew the history of this place," apparently referring to a sex abuse scandal that allegedly occurred many years before and was associated with clergy at the High School, unrelated to Club operations.

18. Plaintiff is informed and believes that additional RPD officers and Sergeant Stronebraker arrived at the Club. With Mr. Paul standing handcuffed nearby, Officer Vallerga told other officers they needed to confirm Mr. Paul "was the guy" or they were going to be "in deep shit." One RPD officer, perhaps Guzman, put Mr. Paul in the back seat of a car for about five minutes. The officers then removed Mr. Paul, took his photograph with a cell phone, and put him back in the car.

19. While Mr. Paul was in RPD custody and still outside the Club, Father Thien Nguyen, who oversees the Club for the Salesian Society, learned from RPD officers, perhaps including Sergeant Stronebraker, that Mr. Paul was accused of molesting A.G. earlier that day in the "book" room. Father Thien showed the officers the "book" room's large, uncovered windows opening into the Club's main area. The RPD officers saw that it would have not been possible for molestation to occur out of the view of staff and members. Father Thien played the surveillance videos, pointing out A.G. and Mr. Paul. He downloaded the videos, which show that Mr. Paul never interacted with A.G. that day, and further that A.G. appeared normal, not as if he had been assaulted by Mr. Paul or anyone else, and gave the computer files to the officers. In sum, Father Thien demonstrated beyond any question that the purported crime as reported did not occur. That should have been the end of the matter. Instead, however, Defendants, including Sergeant Stronebraker, directed Officer Guzman and another officer to take Mr. Paul to the RPD Station jail. While in route, Mr. Paul asked whether he would be able to make a phone call when he got to the station. Both officers assured him access to a telephone, but the RPD never allowed Mr. Paul a call that evening.

20. At the station jail, RPD Officer Ernest Loucas told Mr. Paul he would be doing the "forensic recording" and directed Mr. Paul to remove all of his clothing. Officer Loucas placed each item into a bag marked as evidence. Officer Loucas asked Mr. Paul if he had been read his rights. Mr. Paul said he had not. Officer Loucas chastised another officer and then continued booking clothing. Once Mr. Paul was naked he was given a white jumpsuit. Officer Loucas collected DNA from Mr. Paul's genitals and mouth. Mr. Paul was humiliated and scared. He had not been present when officers had described the allegations to Father Thien, so Mr. Paul still had no idea who made accusations against him, or where and when his actions allegedly occurred.

21. Mr. Paul asked Officer Loucas for a phone call. Officer Loucas said that once the processing was complete Mr. Paul could use the phone. Mr. Paul was then taken to a different cell. Although he had been in police custody for hours, Mr. Paul still had not been told that he was under arrest, informed of the charges or bail, given *Miranda* admonitions, or allowed to make a phone call.

22. Next, an RPD officer or jailor removed Mr. Paul from his cell and took photographs and fingerprints, apparently for booking. Mr. Paul asked to use the phone. That officer or jailor said he could not use the phone until Mr. Paul, "talked to the Detective." That officer or jailor told another officer to let Detective Campos know that Mr. Paul was in his cell and ready to be interviewed. The other officer responded that Detective Campos already knew that. Mr. Paul was not provided a booking slip or any other receipt. He still did not know the charges.

23. Mr. Paul waited a few hours in his cell. He estimates that around 12:30 a.m. he knocked on his cell window and asked an officer: (1) when he could make a phone call, (2) whether he was under arrest, (3) how long could he be held, and (4) when he could speak to a lawyer. The officer told Mr. Paul he could make a phone call after he talked to Detective Campos. Mr. Paul asked the officer those same questions repeatedly over the next five to six hours, but never got a phone call. Mr. Paul was extremely anxious, scared, and confused. He did not sleep at all.

- 6 -

24. Mr. Paul estimates that around 9:30 a.m. he saw an officer who appeared to be a higher rank. Plaintiff is informed and believes that he was the watch commander, RPD Sergeant Gray. Mr. Paul got the supervisor's attention and said that he had been told he would get his phone call over twelve hours ago, but still had no access to a phone. Mr. Paul added that he had not been told he was under arrest or what the charges were. The supervisor said that Mr. Paul could make a call. When Mr. Paul tried calling his parents in Vancouver, Washington, however, he learned that the phone did not allow for long distance. Mr. Paul called his girlfriend who, in turn, called his mother, who in turn called the RPD jail. Mr. Paul was allowed to speak with his mother, but not in privacy. When she asked what kind of lawyer he needed, Mr. Paul responded that he did not yet know why he was being held. He handed an officer the receiver, with his mother still on the line, and returned to his cell. Mr. Paul could hear the officer telling his mother that he was charged with 18 counts of sexual assault including sodomy and oral copulation with a minor. This was the first time he heard the charges against him. Mr. Paul was horrified, humiliated, and distraught.

25. Around 1:30 p.m., Detective Campos escorted Mr. Paul to an interview room. After Detective Campos began questioning, Mr. Paul asked to be read his rights so that he could request an attorney. Detective Campos responded that, "he just wanted to get to know [Mr. Paul] a little." Mr. Paul began crying. He was terrified and just wanted to speak with an attorney so he could provide the videos he knew would show he was innocent. Mr. Paul told Detective Campos he did not want to talk to him, but just wanted to hear his rights so he could talk to an attorney. Detective Campos told Mr. Paul his rights. Mr. Paul requested an attorney. After Mr. Paul invoked, however, Detective Campos still tried to question him. When Mr. Paul again made clear that he wanted counsel, Detective Campos responded, "Good luck in County," and put Mr. Paul back in the cell. Mr. Paul understood this comment as a threat in retaliation for exercising his Fifth-Amendment right to be silent.

26. Within hours of Mr. Paul's arrest, RPD Chief of Police Chris Magnus told Lorna Pardia-Markus, a member of the board of the Boys and Girls Club El Sobrante where Mr. Paul previously worked, that Mr. Paul had been arrested for molesting a member. (This was before Mr. Paul learned of the charges.) Ms. Pardia-Markus, in turn, told Mr. Paul's former boss, Billy Zeier, the manager at the Boys and Girls Club El Sobrante, whom Mr. Paul had previously accused of unethical behavior. Mr. Zeier sent out an email detailing the accusations against Mr. Paul–before Mr. Paul was informed of them–to over twenty-three individuals and to the National Boys and Girls Club Crisis Management team. Those individuals in receipt of Billy Zeier's email then forwarded the message freely to whomever they chose–including the staff at Salesian Boys and Girls Club–causing extreme humiliation and emotional trauma to Mr. Paul. Before long, all the staff at the Salesian Boys and Girls Club knew about the false accusations leading to Mr. Paul's arrest. Members were passing around a mugshot from the internet.

27. At about 5:30 p.m., after twenty-two hours in custody, the RPD finally provided Mr. Paul a meal. The RPD transported Mr. Paul to Contra Costa County Jail. There a deputy offered to house Mr. Paul in protective custody with "other pieces of shit like you." Mr. Paul was already concerned about how he would be treated in jail having been accused of a sex crime against a child, particularly after Detective Campos' comment about "good luck in county." Mr. Paul requested protective custody.

28. At the County Jail, Mr. Paul was asked about suicide. He falsely claimed to be thinking about killing himself so that he would be housed under close supervision and away from other inmates. A deputy listening in said he "wished that [Mr. Paul] was man enough to kill [himself] so the courts didn't have to deal with [him], but [he] was probably too much of a pussy, because of what he did to that kid."

29. At approximately 9:00 p.m. on Saturday November 22, Mr. Paul was placed in a safety cell, and was thereafter monitored on suicide watch. Mr. Paul was unable to sleep until Sunday November 23, two days after he had been taken into custody. Mr. Paul was hyper-vigilant, jumping at every noise or shadow.

30. Mr. Paul finally had the opportunity to speak with a lawyer on Monday, November 24. On Wednesday, November 26, 2015, at 8:00 p.m., Trevor Paul was released from the Contra Costa County Jail with no charges filed. He spent five agonizing days in custody without ever being charged with a crime.

31. After the release, the RPD said the investigation was ongoing and Mr. Paul was still a suspect. The Club, knowing that Mr. Paul had been accused falsely, put him on paid leave, a burden for the small non-profit. The RPD allowed its black cloud over Mr. Paul to persist. Finally, on May 6, 2015, Sergeant Matt Stonebraker and Contra Costa County Deputy District Attorney Bruce Flynn provided letters confirming there was no evidence against Mr. Paul. On August 24, 2015, the Superior Court of Contra Costa County entered a finding of factual innocence.

**DAMAGES**

32. As a direct and proximate result of the aforesaid acts and omissions, and the customs, practices, policies and decisions of the Defendants alleged in this complaint, Plaintiff can no longer work in his chosen field of youth guidance and development. He has been compelled by this incident to switch careers and geographic areas. He suffered the humiliation of being falsely arrested at his place of work, and then suffered through more than five days wrongful imprisonment, causing him injury in his reputation, health and person. He suffered and will continue to suffer great emotional, mental and physical pain, suffering, anguish, fright, nervousness, anxiety, shock, humiliation, indignity, embarrassment, harm to reputation, and apprehension, which have caused, and will continue to cause, Plaintiff to sustain general damages in a sum to be determined at trial.

33. As a further direct and proximate result of the aforesaid acts, omissions, customs, practices, policies and decisions of the defendants, Plaintiff suffered past and future losses of income which have caused Plaintiff to sustain economic damages in a sum to be determined at trial.

34. As a further direct and proximate result of the aforesaid acts, omissions, customs, practices, policies and decisions of the defendants, plaintiff incurred legal, medical and other expenses, and will incur future medical and other expenses, which have caused plaintiff to sustain damages in a sum to be determined at trial.

35. Plaintiff now has a horrendous felony arrest in his history.

36. The individually named and doe defendants, excluding defendants City of Richmond and RPD acted outside the scope of their jurisdiction and without authorization of law. The aforementioned acts of the defendants, and each of them, was willful, wanton, malicious and oppressive, with reckless disregard of or deliberate indifference to and with the intent to deprive plaintiff of his constitutional rights, and did in fact violate the aforementioned rights, entitling plaintiff to exemplary and punitive damages in an amount to be proven at the trial of this matter.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

## DEPRIVATION OF CIVIL RIGHTS -- 42 U.S.C. § 1983

(Fourth, Fifth and Fourteenth Amendment – Individual Liability)

37. The individual and doe defendants, while acting under color of law, deprived Plaintiff of his civil rights by violating his rights under the Fourth, Fifth and Fourteenth Amendments. These deprivations include, but are not limited to:

(a) Detaining Plaintiff without reasonable suspicion and in an unreasonable manner;

(b) Handcuffing and patting down Plaintiff during an investigatory detention without reasonable suspicion that he was armed and dangerous;

(c) Arresting Plaintiff without probable cause and in an unreasonable manner;

(d) Continuing to detain and arrest Plaintiff after any arguable grounds for probable cause dissipated;

(e) Denying Plaintiff his federal due process right to a timely telephone call pursuant to Cal. Penal Code § 851.5;

    (f)    Prolonging Plaintiff's incarceration by failing to investigate or relay material facts;

    (g)    On information and belief, either failing to obtain a court's probable cause determination within 48 hours of the arrest, or submitting an incomplete, false and misleading declaration in support of the request for a determination of probable cause;

    (h)    Retaliating against Plaintiff for exercising his Fifth-Amendment right to counsel; and

    (i)    Defaming Plaintiff in his profession and destroying his career.

38.  The above acts and omissions, while carried out under color of law, have no justification or excuse in law, and instead constitute a gross abuse of governmental authority and power, shock the conscience, are fundamentally unfair, arbitrary and oppressive, and unrelated to any activity in which governmental officers may appropriately and legally undertake in the course of protecting persons or property, or ensuring civil order.  The above acts and omissions were consciously chosen from among various alternatives.

## SECOND CLAIM FOR RELIEF
## DEPRIVATION OF CIVIL RIGHTS – 42 U.S.C. § 1983
### (Entity Liability)

39.  At all times herein mentioned, defendants City of Richmond, RPD, and Chief Magnus, acted with deliberate indifference, and conscious and reckless disregard to the safety, security and constitutional and statutory rights of Plaintiff and others similarly situated, including the right to be free from unreasonable searches and seizures, and arrest based on insufficient evidence, instituted policies and allowed constitutional violations as alleged herein, including but not limited to:

    (a)    Failing to adequately train, supervise, and control RPD officers when investigating alleged sex crimes involving minors;

(b)     Failing to adequately train, supervise and control RPD officers in conducting searches pursuant to detentions or arrests;

(c)     Failing to adequately train, supervise, and control RPD officers in conducting detentions without reasonable suspicion or arrests without probable cause;

(d)     Failing to adequately train, supervise, and control RPD officers in the treatment of arrestees, including insuring access to telephones pursuant to Cal. Penal Code § 851.5 and timely admonitions pursuant to *Miranda*;

(e)     Allowing RPD arrestees to be sent to County jail in retaliation for not waiving rights, including the right to counsel and the right to remain silent;

(f)     Allowing RPD officers to bypass the requirement of a 48-hour determination of probable cause, or to submit incomplete, false and misleading declarations;

(g)     Failing to adequately discipline RPD officers involved in misconduct, dishonesty or otherwise abusing their authority; and

(h)     Condoning and encouraging RPD officers in the belief that they can violate the rights of persons such as Plaintiff with impunity, and that such conduct will not adversely affect their opportunities for promotion and other employment benefits.

40.     As a direct and proximate result of the foregoing, Plaintiff sustained injury and damage as proved.

**THIRD CLAIM FOR RELIEF**
**DEPRIVATION OF CIVIL RIGHTS -- CALIFORNIA CIVIL**
**CODE §§ 52 AND 52.1**

28.     All defendants are subject to liability under California Civil Code §§ 52 and 52.1 because the individual and doe defendants violated plaintiff's constitutional and statutory rights and did so with threats, intimidation or coercion. Defendants violated Plaintiff's right to be free of unlawful seizure made without probable cause, as

guaranteed under both the U.S. and California constitutions, and his statutory right to bodily integrity as guaranteed by California Civil Code § 43. Defendants violated each of these rights through the use of threats, coercion and intimidation, including imprisoning him for more than five days, in part in retaliation for Plantiff's exercising his rights to consult counsel before interrogation, and to refuse to answer questions.

29. The above acts and omissions had no justification or excuse in law, and instead constitute a gross abuse of governmental authority and power, express deliberate indifference, shock the conscience, are fundamentally unfair, arbitrary and oppressive, and unrelated to any activity in which governmental officers may appropriately and legally undertake in the course of protecting persons or property, or ensuring civil order.

41. As a direct and proximate result of the foregoing, Plaintiff sustained injury and damage as proved.

## FOURTH CLAIM FOR RELIEF
## FALSE ARREST AND IMPRISONMENT

42. On November 21, 2015, Defendants arrested Plaintiff without probable cause, and continued to incarcerate him through November 26, 2015, even though they had exonerating evidence.

43. As a direct and proximate result of the foregoing, Plaintiff sustained injury and damage as proved.

## PRAYER

WHEREFORE, plaintiff requests relief as follows, and according to proof, against each defendant:

1. General and compensatory damages in an amount according to proof;
2. Special damages in an amount according to proof;
3. Exemplary and punitive damages against each individual and Doe defendant, not against the City of Richmond or the RPD, in an amount according to proof;

1    4.   Costs of suit, including attorneys' fees, under 42 U.S.C. § 1988; and,

2    5.   Such other relief as may be warranted or as is just and proper.

Dated:   November 30, 2015          THE LAW OFFICES OF JOHN BURTON
                                    HADDAD & SHERWIN

                              By:   /S/ John Burton
                                    _____
                                    John Burton
                                    Attorneys for Plaintiff

## DEMAND FOR JURY TRIAL

Plaintiff demands trial by jury.

Dated:   November 30, 2015          THE LAW OFFICES OF JOHN BURTON
                                    HADDAD & SHERWIN

                              By:   /S/ John Burton
                                    _____
                                    John Burton
                                    Attorneys for Plaintiff